Filed 8/23/16  Solano v. Rugiere Nelson Galvez Marcucci et al. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| HIPOLITO SOLANO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RUGIERE NELSON GALVEZ MARCUCCI et al., <br><br> Defendants and Respondents. | B261283 <br><br> (Los Angeles County <br> Super. Ct. No. BC524540) |


APPEAL from an order of the Superior Court of Los Angeles County, Michelle R. Rosenblatt, Judge.  Reversed.

Holland & Knight, Richard T. Williams, Marissa E. Buck and Kristina Azlin for Plaintiffs and Appellants.

Culver Law Group and Justin D. Graham for Defendants and Respondents.

_____

# INTRODUCTION

The appeal is taken from an order granting respondents' motion to quash service of summons for lack of personal jurisdiction.

Appellants are five California residents who individually invested money in a series of condominium construction projects in Panama. Respondents, three Panamanian real estate developers and two of their corporate officers, at various times met, corresponded, and/or contracted with the California appellants in connection with the Panama condominium construction projects.

Appellants contend the trial court erred in granting the motion to quash because they satisfied their burden of producing competent evidence showing that each of the respondents had the requisite minimum contacts with California for California to exercise specific jurisdiction and respondents failed to present a compelling case showing the exercise of jurisdiction would be unfair. We agree. For the reasons stated below, we reverse the order and remand for further proceedings in light of the court's opinion.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *The Parties*

Solano and his wife, Gloria Solano Canton; Molina; Pablo Saldana (Saldana); and Maria Lorena Batanero (Batanero) are all residents of California (collectively plaintiffs).

Respondents Rugiere Nelson Galvez Marcucci (Marcucci) and his daughter, Vasquez, are residents of Panama. Respondents R.G. Hotels, Inc. (R.G. Hotels); R.G. Inmobiliaria, S.A. (Inmobiliaria); and Casa de Campo Farallon, S.A. (Farallon) are corporations formed under Panamanian law and headquartered in Panama (collectively

---

[1] The motion to quash was decided based on the declarations of appellants Hipolito Solano (Solano) and Jose Molina (Molina), the declaration of respondent Maruquel Galvez Vasquez (Vasquez), and authenticated exhibits. Because Solano and Molina each recount virtually identical experiences and contacts with the respondents, we primarily refer to Solano's declaration and authenticated exhibits in this section, adding facts from the record concerning the other parties where appropriate.

defendants or Panamanian defendants). R.G. Hotels, Inmobiliaria, and Farallon develop real estate in Panama, have been doing so for over 13 years, and have collectively been involved in projects worth over $1 million. Vasquez is the Chief Executive Officer of R.G. Hotels and Inmobiliaria, a corporate officer of Farallon, a shareholder of all three companies, and has executed contracts with the plaintiffs on behalf of Inmobiliaria. Marcucci is the president of R.G. Hotels, legal representative of Inmobiliaria and Farallon, and has executed contracts with the plaintiffs on behalf of Inmobiliaria and Farallon.

B.      *2008 Investments in Casa Grande Bambito Highland Resort Project*

In April 2008, Solano, who is not an experienced investor, received an unsolicited telephone call at his home from an assistant to Carter Hernandez (Hernandez)[2] praising real estate investments in Panama. The caller introduced Hernandez, who told Solano the real estate market in Panama was a "booming" business and that Solano should consider investing in Panamanian real estate.

After repeated telephone calls to Solano, Solano and his wife agreed to meet with Hernandez at their home, where Hernandez presented information regarding specific real estate projects in Panama. During the visit, Hernandez represented that he had traveled to Panama, had worked with Marcucci and Vasquez, and knew them to be experienced and trustworthy developers. According to Vasquez, the Panamanian defendants did not hire Hernandez as their real estate agent and did not authorize him to make representations on their behalf. However, Hernandez represented that the Panamanian defendants had authorized him to market in Southern California condominiums for the Casa Grande Bambito Highland resort (Bambito). Hernandez gave Solano marketing materials for the Bambito, including drawings and renderings of the condominium units and amenities.[3]

---

[2]      Hernandez is not a party to this appeal.

[3]      The materials did not specifically identify any of the Panamanian defendants as being the source of the materials.

3

Hernandez also told Solano construction had begun on Bambito, that the units would be completed within a year, and that the units would be resold by the developer within six months of completion. Hernandez told Solano that an investment in a unit therefore would lead to a return on the investment, as well as a substantial profit, in just 18 months. The short time frame for gaining profitable returns was critical to Solano because he needed the money to help pay for his children's college education. Solano told Hernandez that Solano and his wife had very limited liquid assets. Hernandez represented that the developers had anticipated this and had authorized Hernandez to use his experience and contacts to help Solano obtain financing in California to pay the down payment on a Bambito unit.

On July 2, 2008, Hernandez held an informational meeting at a hotel in California, which Solano attended along with approximately 22 other potential investors. Hernandez showed Solano and the other potential investors a video and provided pre-printed contracts for the purchase of Bambito condominium units. Hernandez repeated previous representations, including that the Panama developer expected to resell condominium units that would be the subject of each investment within 18 months and that investors would receive a large profit in addition to the return of their original investment upon the sale of the unit. Hernandez told the investors they needed to make a decision quickly or the opportunity would be lost. The Solanos were "swept up" by the pressure from Hernandez's sale tactics and signed contracts to purchase two condominium units[4] within the Bambito project from developer Inmobiliaria (2008 Bambito Purchase Agreement). The 2008 Bambito Purchase Agreement provides for a construction period of 18 months

_____

[4]     The record contains only one 2008 Bambito Purchase Agreement for the Solanos. Plaintiffs' opposition indicates the Solanos purchased "units"; a "Termination Agreement" signed by the Solanos states that the Solanos entered into two purchase agreements, both dated July 2, 2008, and the two cashiers' checks and other documents attached to the Solano declaration indicate the Solanos purchased two units from Inmobiliaria. Given that the actual number of units is not critical to the pertinent issues on appeal, we will assume for purpose of this appeal that the Solanos purchased two units.

4

with an automatic extension for up to six months. It also provides for the owners to occupy the premises after the construction period. In addition, the 2008 Bambito Purchase Agreement includes a choice-of-law provision that states the contract will be "ruled by the laws of the Republic of Panama" and provides for arbitration in Panama of any dispute between the parties. Marcucci signed the Solanos' 2008 Bambito Purchase Agreement on behalf of Inmobiliaria below a provision that states the contract is executed in two counterparts in Panama.[5]

To pay for the down payment on the Bambito units, the Solanos, with the assistance of Hernandez, borrowed against the equity in their home, which increased their monthly mortgage payments by $800. Hernandez also assisted the Solanos in sending to the attention of Vasquez in Panama two cashiers' checks, one in the amount of $67,200 and the other in the amount of $71,200, each made payable to Inmobiliaria, to pay 50 percent of the purchase price for two different Bambito units. After 18 months, the Solanos did not receive any return on their investment.

In April 2010, Hernandez invited Solano and other California investors to meet with Vasquez. Vasquez traveled to California and met with Solano and other California investors on May 8, 2010. Vasquez handed out her business card, which identified her as the Chief Executive Officer for both Inmobiliaria and R.G. Hotels. During the meeting, Vasquez represented to investors that Bambito was still under construction and had not yet opened. Vasquez asked the investors to be patient and assured the investors that they would receive a return on their investment when the condominium units were sold, but stated it would take another six months for completion and sale. She told Solano and the

---

[5] On August 28, 2008, Batanero, Molina, and Saldana each signed an agreement virtually identical to the Solanos' 2008 Bambito Purchase Agreement, and each made a down payment of $50,000 toward purchase of his or her own unit within Bambito. The initial paragraph in each plaintiff's contract provides in print that the "undersigned," Marcucci, is acting on behalf of and in representation of Inmobiliaria. However, each of these contracts appears to bear the signature of Vasquez.

other investors that she could not return their investment at that time because their investment funds were "tied up in construction."

C. *Termination of 2008 Bambito Purchase Agreement and Execution of 2011 Playa Blanca Agreement*

Solano did not hear anything further about his units at Bambito until April 2011, when Hernandez invited the Solanos and other investors, including Molina, Saldana, and Batanero, to a second meeting with Vasquez. Vasquez traveled to Los Angeles to meet with the investors on or about April 15, 2011. During the meeting, Vasquez and Hernandez told investors that Bambito was not progressing as expected and that construction was not complete. Vasquez and Hernandez informed Solano and other investors that their investments would therefore be exchanged for ownership of units at a different resort, the Condo-Hotel Royalton Playa Blanca resort (Playa Blanca). They told investors that Playa Blanca was a larger project and represented that the project was nearly complete. They also told investors that the units in Playa Blanca were more expensive than Bambito and that the investors therefore would be organized into groups, with each of their individual investments being combined into one unit that they would share. Vasquez and Hernandez stated that the investors had no choice in these decisions. Vasquez and Hernandez assured Solano and the other investors that the Playa Blanca condominium unit would ultimately be resold to a third party by October 2012 and that the Solanos and the other investors in the unit would receive the return of their investment along with a profit. After hearing Vasquez's and Hernandez's representations, Solano and several other investors asked Vasquez and Hernandez to immediately return the money they had invested. Vasquez and Hernandez told Solano it would be impossible to return the money because the money was "tied up in construction."

To complete the transfer of their investments, the Solanos and other investors were told to sign several contracts that were distributed to the investors during the April 2011 meeting. The contracts each contained preprinted terms identifying each investor, the

6

unit(s) purchased, and amounts previously paid as down payments. Vasquez made it clear to investors that the terms of each contract were nonnegotiable. The Solanos believed signing each contract was the only way they would get back the money they had invested.

One of the documents Vasquez and Hernandez gave the Solanos and other investors to sign was a Termination Agreement. The Solanos' Termination Agreement, dated April 15, 2011, provides that the Solanos' 2008 Bambito Purchase Agreements are terminated and that the parties would be entering into a new purchase agreement that would combine their investment in two units at Bambito into a different single condominium unit within the same Bambito resort. It also provides that the Solanos would agree to a mutual release from any claims and demands known and unknown in any way connected to the 2008 Bambito Purchase Agreements.

At the same time, Vasquez and Hernandez instructed the Solanos and other investors to sign a new Bambito purchase agreement (2011 Bambito Purchase Agreement). The Solanos' 2011 Bambito Purchase Agreement, dated April 15, 2011, transfers the Solanos' 50-percent down payment for two units under the 2008 Bambito Purchase Agreements into a total down payment of $138,400 for a different condominium unit within the same Bambito resort. The 2011 Bambito Purchase Agreement provides that Inmobiliaria is authorized to resell the unit to a third party on behalf of the Solanos for a minimum profit of $10,000. It also contains a provision for a construction period of no more than 18 months and states that, if Inmobiliaria does not complete the construction or resell the unit with a profit by the end of the 18-month period, Inmobiliaria would have to execute a promissory note in the amount of $138,400 with interest to the Solanos that would be payable after six months from execution of the note. Vasquez and Hernandez instructed Solano and his wife to sign this agreement but did not explain why the 2011 Bambito Purchase Agreement was necessary.[6] Vasquez

---

[6] Both the Termination Agreement and 2011 Bambito Purchase Agreement also contain choice-of-law provisions that are similar to the provision contained in the 2008

signed both the Termination Agreement and 2011 Bambito Purchase Agreement on behalf of Inmobiliaria

The Solanos also signed a second Termination Agreement (Second Termination Agreement), which provides that it terminates the Solanos' 2011 Bambito Purchase Agreement. The recitals in the Second Termination Agreement acknowledge that the Solanos paid a total of $138,400 to Inmobiliaria pursuant to the 2008 Bambito Purchase Agreements and that the amount had been credited under the 2011 Bambito Purchase Agreement towards the purchase of a single unit. It provides, however, that the $138,400 would not be reimbursed, but, instead, would be applied as credit towards the purchase from developer Farallon of a co-ownership share of a single condominium unit within the Playa Blanca resort. Additionally, the recitals provide that the parties would agree to a mutual release "from all claims and demands of every kind and nature" in any way connected to the 2011 Bambito Purchase Agreement, including a claim to the repayment of the original purchase price of $138,400. Printed on the first page of the agreement is the date October 8, 2011.[7] Marcucci signed the Second Termination Agreement on behalf of Inmobiliaria.

During the April 2011 meeting, Vasquez and Hernandez also told the Solanos to sign a new purchase agreement providing for the Solanos to become co-owners with Molina, Saldana and Batanero of a single condominium unit in a different Panama resort project, the Playa Blanca (2011 Playa Blanca Purchase Agreement).[8] The Playa Blanca

---

Bambito Purchase Agreement and state that the law of Panama is to be applied to any disputes.

[7] The Panamanian defendants argue based on the execution date for the agreement and in contradiction to the Solano and Molina declarations that the Second Termination Agreement was signed by the plaintiffs in October 2011, not in April 2011. The Vasquez declaration does not address the date the Second Termination Agreement was signed.

[8] The Second Termination Agreement, 2011 Playa Blanca Purchase Agreement, and Rental Program Agreement contain a similar choice-of-law provision to the 2008 and 2011 Bambito Purchase Agreements.

Purchase Agreement provides for the sale of the unit by the developer, Farallon, to the five plaintiffs for the total sale price of $288,400. The 2011 Playa Blanca Purchase Agreement provides that Farallon promises to resell the unit on behalf of the plaintiffs to a third party for a price up to $337,450 no later than twelve months from the execution of the agreement and states that each of the plaintiffs will share in a percentage of the profit based on their prior investment once the unit is sold. The 2011 Playa Blanca Agreement also authorizes the unit during the period of the agreement to be rented through developer Farallon and for the plaintiffs to receive a share of rental income from a rental pool in accordance with a separate rental agreement the plaintiffs each signed with Farallon (Rental Program Agreement).[9] On behalf of Farallon, Marcucci signed the 2011 Playa Blanca Agreement and Rental Program Agreement under a printed provision that provides the contract was executed in counterparts as of October 8, 2011, in Panama.

In August 2011, after the Solanos and Molina declared they had signed their copy of the 2011 Playa Blanca Purchase Agreement, Vasquez asked Solano and Molina to fly from California to Panama at the expense of Farallon to visit Playa Blanca for its "grand opening." During the visit, Marcucci told Solano and Molina that Farallon was an experienced developer with the expertise and resources to resell the Playa Blanca condominium units. Both Marcucci and Vasquez told Solano and Molina that their Playa Blanca unit would be among the first to be resold.

By February 2012, Solano had not received any payments under the Rental Program Agreement and began calling and emailing Vasquez in Panama in an attempt to obtain his investment earnings. Vasquez communicated via email with Solano about the issue, then referred Solano to a representative in the accounting department of R.G. Hotels. After six months and almost 30 emails, Solano received from R.G. Hotels three

---

[9]     Batanero, Molina and Saldana also signed similar 2011 Bambito Purchase Agreements and Termination Agreements. They also signed and were parties along with Solano to the same Playa Blanca Purchase Agreement and Rental Program Agreement with Farallon.

money transfers for rental payments, but they were much less than Solano had expected. Solano and Molina also sent emails to Marcucci regarding the return on their investments because their 2011 Playa Blanca Purchase Agreement was scheduled to expire on October 8, 2012. On October 6, Marcucci told Molina via email that he would talk to Molina in a few days, but he did not have any further communication with Molina. On October 11, after the 2011 Playa Blanca Purchase Agreement had expired, Marcucci sent an email to Solano representing to Solano he would receive documents canceling his investment the following Tuesday, but neither Solano nor Molina received the documents or return of their money. After receiving repeated complaints from the plaintiffs, Hernandez also emailed Marcucci stating that the investors were complaining and urged Marcucci to respond to the investors. On October 17, 2012, Marcucci told Hernandez via email that the plaintiffs' investments would be canceled or reversed. The plaintiffs did not receive any cancelation documents or the return of money they invested in any of the Panama resort projects.

D.    *Complaint and Motion To Quash Service of Summons*

On October 15, 2013, plaintiffs filed a complaint against the Panamanian defendants and Hernandez for rescission of all the contracts with the Panamanian defendants or, alternatively, damages. The complaint alleges generally that the Panamanian defendants and Hernandez made false representations and material omissions to induce the plaintiffs to invest in the Bambito and Playa Blanca projects and execute the various contracts with the Panamanian defendants. It also alleges that each of the defendants was acting as an agent of the other defendants. The complaint alleges causes of action against the Panamanian defendants for intentional misrepresentation, fraudulent concealment, negligence, breach of the 2011 Playa Blanca Purchase Agreement, and violation of the California Vacation Ownership and Time-share Act of 2004 (Bus. & Prof. Code, § 11210 et seq.). Plaintiffs received authorization from the court to serve and did serve the Panamanian defendants in Panama by mail.

10

The Panamanian defendants specially appeared, and on May 30, 2014, moved to quash service of summons and complaint for lack of personal jurisdiction. In their moving papers, the Panamanian defendants conceded that the controversy arises out of their contacts with California. They argued, however, that they do not have sufficient minimum contacts with California for California to exercise personal jurisdiction over them and that asserting such jurisdiction would be unreasonable.

In separate subsequent filings, the Panamanian defendants filed in support of their motion to quash the declaration of Vasquez and numerous exhibits. In her declaration, Vasquez declares that she is an officer and shareholder of R.G. Hotels, Inmobiliaria, and Farallon. She also declares that she met Hernandez in Panama while he was on vacation, learned that he was a real estate agent licensed to practice in California, and discussed Hernandez helping the Panama corporate defendants to find investors for various real estate projects in Panama. Additionally, she declares that the Panamanian defendants promised Hernandez a commission for every investor he referred to them, but "did not hire, retain or employ" Hernandez to market their real estate projects in California. She declares the Panamanian defendants also did not authorize Hernandez to advise prospective buyers to pull equity out of their homes and had no authority over the content of his presentations. Finally, Vazquez declares, "[w]e simply had our own Panamanian attorneys and agents who drafted purchase agreements, in Spanish and English, for every California investor he sent our way." The declaration did not set forth any additional facts in support of the Panamanian defendants' motion. No other declarations were filed in support of the motion.

Plaintiffs filed several briefs opposing the motion, along with the supporting declarations of Solano and Molina, and numerous authenticated exhibits. Plaintiffs' briefs set forth as to each of the Panamanian defendants the specific contacts each had with California. Plaintiffs also argued that minimum contacts for each of the Panamanian defendants could be shown essentially based on several theories of jurisdiction: (1) through Hernandez's alleged agency relationship with the Panamanian defendants; (2) through each of the Panamanian defendants' individual contacts with California; and

11

(3) through Vasquez's and Marcucci's contacts with California as officers and legal representatives of the corporate Panamanian defendants.

E.    *Entry of Order Quashing Service of Summons*

On November 19, 2014, the trial court entered an order granting the motion to quash. The trial court ruled that plaintiffs had not met their burden of establishing that the Panamanian defendants had purposely availed themselves of the privilege of conducting business in California. The court determined the fact that the Panamanian defendants had conceded the case had a substantial relationship with California was a moot issue, given the lack of minimum contacts. As to fairness, the court stated there was little evidence regarding Hernandez's agency relationship with the Panamanian defendants. It thus concluded exercise of jurisdiction in California would be unfair. The court's specific findings and conclusions, as they relate to the contentions on appeal, are set forth in the discussion below.

**DISCUSSION**

A.    *Standard of Review*

On appeal from an order granting a motion to quash, if the facts concerning jurisdiction are not in conflict, whether a defendant's contacts with California are sufficient to justify the exercise of personal jurisdiction is a question of law that we review de novo. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*); *Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 980 (*Anglo Irish*).) If there is a conflict concerning the jurisdictional facts, we review the trial court's factual determinations for substantial evidence. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 (*Pavlovich*); *Anglo Irish*, *supra*, at p. 980; *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.) "Even then, we review independently the trial court's conclusions as to the legal significance of the facts." (*Dorel Industries, Inc. v. Superior Court* (2005) 134 Cal.App.4th 1267, 1273.) "The ultimate question whether jurisdiction is fair and reasonable under all of the

12

circumstances, based on the facts that are undisputed and those resolved by the court in favor of the prevailing party, is a legal determination warranting our independent review." (*Integral Development Corp.*, supra, at p. 585.)

From our review of the record, we conclude that the facts material to the question of personal jurisdiction, as set forth in the declarations of Solano, Molina, and Vasquez, together with the authenticated exhibits, are not in dispute.[10] However, the parties contest the legal conclusions to be drawn from those facts. We will therefore conduct an independent review of the record and are not bound by the trial court's legal conclusions. (See *Anglo Irish*, *supra*, 165 Cal.App.4th at p. 980; *Integral Development Corp. v. Weissenbach*, *supra*, 99 Cal.App.4th at p. 585.)

B.      *Law Governing Personal Jurisdiction*

California's long-arm statute grants to its courts the authority to assert personal jurisdiction over a nonresident on any basis consistent with the United States or California Constitutions. (Code Civ. Proc., § 410.10; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 (*Vons*).) Thus, a California court may assert personal jurisdiction over a nonresident defendant who has not been served with process within the state so long as the defendant has sufficient "minim[al] contacts" with the state that asserting personal jurisdiction would not "violate '"traditional notions of fair play and substantial justice."'" (*Vons*, *supra*, at p. 444, quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [66 S.Ct. 154, 90 L.Ed. 95]; accord, *Pavlovich*, *supra*, 29 Cal.4th at p. 268.) "Minimum contacts exist where the defendant's conduct in, or in connection with, the forum state is such that the defendant should reasonably

---

[10]      Although the Panamanian defendants argued in contradiction to facts set forth in the plaintiffs' declarations that Vasquez only traveled once to California, that the plaintiffs did not communicate with Marcucci prior to 2012, and that the Second Termination Agreement was signed by the plaintiffs in October 2011, not April 2011, the Panamanian defendants' contrary facts are not set forth in a declaration or authenticated exhibit. These are thus insufficient to create a conflict in the evidence.

13

anticipate being subject to suit in that state." (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 429.) The minimum contacts test "'is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present." (*Snowney*, *supra*, 35 Cal.4th at p. 1061, quoting *Kulko v. California Superior Court* (1978) 436 U.S. 84, 92 [98 S.Ct. 1690, 56 L.Ed.2d 132].)

"Under the minimum contacts test, '[p]ersonal jurisdiction may be either general or specific.'" (*Snowney*, *supra*, 35 Cal.4th at p.1062, quoting *Vons*, *supra*, 14 Cal.4th at p. 445.) Our review concerns only specific jurisdiction, as plaintiffs are not contending the Panamanian defendants are subject to general jurisdiction.[11] Specific jurisdiction requires a sufficient connection between the defendant, the state, and the litigation. (*Snowney*, *supra*, at p. 1062; *In re Automobile Antitrust Cases 1 & 11* (2005) 135 Cal.App.4th 100, 109 (*Automobile Antitrust*).) "A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposely availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum"' [citation]; and (3) '"the assertion of personal jurisdiction would comport with 'fair play and substantial justice'"' [citation]." (*Pavlovich*, *supra*, 29 Cal.4th at p. 269, quoting *Vons*, *supra*, at p. 447.)

When a nonresident defendant challenges personal jurisdiction by a motion to quash, the plaintiff has the initial burden of demonstrating by a preponderance of the evidence facts establishing (1) purposeful availment, and (2) a substantial connection between the controversy and the defendant's forum contacts. (*Snowney*, *supra*, 35 Cal.4th at p. 1062; *Anglo Irish*, *supra*, 165 Cal.App.4th at p. 980) "The jurisdictional facts shown must pertain to each separate nonresident defendant . . . ." (*Automobile Antitrust*, *supra*, 135 Cal.App.4th at p. 110.) If the plaintiff meets the initial burden of

---

11    Plaintiffs' opposition papers in the trial court stated, "[p]laintiffs do not seek to assert 'general jurisdiction' over the Panama[nian] [d]efendants, only 'specific jurisdiction.'"

showing a defendant's minimum contacts, the burden shifts to the defendant to demonstrate "'that the exercise of jurisdiction would be unreasonable.'" (*Pavlovich*, *supra*, 29 Cal.4th at p. 273, quoting *Vons, supra,* 14 Cal.4th at p. 449.)

        1.     Purposeful Availment

A nonresident defendant is deemed to have purposely availed himself or herself of the forum if the defendant "'""purposefully direct[s]" [its] activities at residents of the forum' [citation], '"purposefully derive[s] benefit" from' its activities in the forum [citation], 'create[s] a "substantial connection" with the forum' [citation], '"deliberately" has engaged in significant activities within' the forum [citation], or 'has created "continuing obligations" between [itself] and residents of the forum' [citation]." (*Snowney*, *supra*, 35 Cal.4th at p. 1063, quoting *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472, 473, 475-476 [105 S.Ct. 2174, 85 L.Ed.2d 528] (*Burger King*); accord, *Pavlovich*, *supra*, 29 Cal.4th at p. 269.) "[T]he '"purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," fortuitous," or "attenuated" contacts . . . .'" (*Snowney*, *supra*, at p. 1063, quoting *Burger King*, *supra*, at p. 475.) The requirement focuses on the defendant's intentions and is "'satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.]" (*Pavlovich*, *supra*, 29 Cal.4th at p. 269.) The requirement "does not hinge mechanically on whether the plaintiff's claim sounds in tort or contract. Rather, a court must apply '"a 'highly realistic' approach"' on a case-by-case basis and select the most appropriate test for purposeful availment based on the particular facts presented. [Citations.]" (*Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1571, quoting *Vons*, *supra*, 14 Cal.4th at p. 450.)

Plaintiffs contend that the trial court erred in granting the Panamanian defendants' motion to quash. They argue, based on *Snowney* and *Anglo Irish*, that the trial court did not assess the ample uncontested evidence in the record demonstrating purposeful

15

availment by Vasquez, Marcucci, and the other Panamanian defendants and did not apply the correct legal principle to such evidence in granting the Panamanian defendants' motion to quash. Having reviewed the record in its entirety, we conclude the nature and quality of activity by Vasquez and Marcucci was sufficient to demonstrate purposeful availment as to these individual defendants. We also conclude the trial court erred in not considering whether purposeful conduct of these corporate officers could be attributed to the remaining Panamanian defendant corporations.

### a. *Vasquez's and Marcucci's Contacts with California*

In assessing purposeful availment, although the trial court acknowledged the plaintiffs' factual assertions in their opposition briefs that Marcucci and Vasquez each had contacts with the plaintiffs, the court stated regarding Marcucci and Vasquez, "there is no indication that [Marcucci] did anything other than sign the contract for [Inmobiliaria]. There is no indication that he executed the contract in the United States or had any contact with [p]laintiffs prior to the 2012 emails. The same is true as to [Vasquez], who purportedly signed all the agreements. . . . There is no indication that these contracts were signed in the United States."

However, the evidence in the record, which was not disputed, demonstrates Marcucci did have contact with the plaintiffs prior to 2012 and that Vasquez's and Marcucci's role in plaintiffs' contractual relationships was neither limited nor passive. Solano and Molina each declared that in April 2010, Vasquez met in California with plaintiffs and other investors, assured investors that they would receive a return on their investment once Inmobiliaria sold the condominium units, and convinced the California investors to wait an additional six months for the return of their investments. Solano and Molina also declared that on April 15, 2011, Vasquez met a second time in California with plaintiffs and made additional alleged misrepresentations to plaintiffs, including that the Playa Blanca units would be resold in 12 months and that the individual investors would receive their investment back with a profit in addition to rental income. Each of

16

these representations is alleged as a basis for plaintiffs' fraud, negligence, and breach of contract causes of action.

Plaintiffs' evidence also shows that Vasquez's visits to California were not random, attenuated, or fortuitous. Solano and Molina declared that during the second in-person meeting in Los Angeles in April 2011, Vasquez induced the plaintiffs to sign approximately 12 additional agreements with Inmobiliaria and Farallon. Both Vasquez and Marcucci signed those agreements on behalf of the two corporate defendants. The additional agreements had the end result of prolonging what plaintiffs originally intended on being short-term investments in Panama for another 12 months and preserved the financial benefit the Panamanian defendants were receiving from the plaintiffs' investments. Further, with the exception of the Molina Termination Agreement and 2011 Bambito Purchase Agreement, each of the plaintiffs' Termination Agreements and 2011 Bambito Purchase Agreements appear to bear Vasquez's signature and indicate they were executed on April 15, 2011, the date both Solano's and Molina's declarations state that Vasquez met with them and the other California investors in Los Angeles.

Although Marcucci did not join Vasquez in California in April 2011 when the 12 additional contracts were signed by plaintiffs, he did sign the 2011 Playa Blanca Agreements and Rental Program Agreements on behalf of Farallon, which were executed after Marcucci personally met with Solano and Molina. Solano and Molina both declared that, at the specific invitation of Vasquez, Solano and Molina traveled to Panama in August 2011 at Farallon's expense and met with both Marcucci and Vasquez. Both Marcucci and Vasquez assured Solano and Molina that Farallon was an experienced developer and assured Solano and Molina that their Playa Blanca unit would be among the first to be resold.

Vasquez's declaration does not deny any of the assertions in Solano's or Molina's declarations regarding her 2010 and 2011 meetings in California with plaintiffs. Indeed, Vasquez's declaration does not address her 2010 or 2011 meetings with the plaintiffs, any alleged representations she may have made to plaintiffs, the circumstances surrounding each of the agreements she presented to plaintiffs and other investors for signature in

17

April 2011, Vasquez's and Marcucci's meetings with Solano and Molina in August of 2011, or the corporate structures or relationships among the various Panamanian corporate defendants. Marcucci did not submit a declaration in support of the motion to quash. Nevertheless, defendants cite *Taylor-Rush v. Multitech Corp.* (1990) 217 Cal.App.3d 103 (*Taylor-Rush*) to argue purposeful availment cannot be shown as to Marcucci because he did not engage in a conspiracy with Hernandez or the other Panamanian defendants and was acting in his capacity as a corporate officer when signing the contracts with plaintiffs. However, plaintiffs are not asserting conspiracy as a basis for California's exercise of jurisdiction. Further, *Taylor-Rush* supports plaintiffs' argument that Vasquez's and Marcucci's contacts with California are sufficient for California to exercise jurisdiction.

In *Taylor-Rush*, the plaintiff, a California resident and former owner of a California corporation, sued six nonresident, corporate officers and directors of a Delaware corporation alleging fraud, breach of contract, and conspiracy. The plaintiff alleged the defendants induced her to sell her stock in the California corporation by making fraudulent misrepresentations and nondisclosures. Pursuant to the parties' agreement, the Delaware corporation acquired the plaintiff's company through a stock exchange and the plaintiff became employed by the defendants' company. During the negotiations of the agreement, the defendants made various representations to the plaintiff in both California and New York. When the defendants' company did not have money to pay the plaintiff under the agreement, the plaintiff's stock in the defendants' company became worthless. (*Taylor-Rush*, *supra*, 217 Cal.App.3d at pp. 108-109.)

The court found sufficient minimum contacts to establish personal jurisdiction as to two of the defendants, Messinger and Carow. The court found the evidence showed "that, *while in California*, Messinger made fraudulent misrepresentations and nondisclosures which induced [the plaintiff] to execute the buy/sell, employment and settlement agreements. . . . There is no question that the minimum contacts test was met and personal jurisdiction over him was acquired by virtue of his tortious acts within California purposely directed at [the plaintiff]." (*Taylor-Rush*, *supra*, 217 Cal.App.3d at

18

p. 114.)  The plaintiff's evidence "also established that Carow made fraudulent misrepresentations and nondisclosures during their meeting in New York which led to [the plaintiff's] execution of the settlement agreement. . . .  While Carow's contacts with California were not as extensive as those of Messinger, in that he only met with [the plaintiff] in New York, his alleged tortious conduct outside California was purposely directed at [the plaintiff] in California and had a tortious effect here.  Thus, sufficient minimum contacts were established for personal jurisdiction." (*Ibid*.; see also *Burger King, supra*, 471 U.S. at p. 476 ["[j]urisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State"; "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there"].)

Similarly, here, given the evidence in the record concerning Vasquez's and Marcucci's business activities and numerous communications directed at plaintiffs in California, and the effect those business activities and communications had on plaintiffs in California, we conclude plaintiffs have satisfied their burden of demonstrating purposeful availment as to Vasquez and Marcucci.  (See *Taylor-Rush*, *supra*, 217 Cal.App.3d at p. 114; see also *Burger King*, *supra*, 471 U.S. at pp. 475-476; *Snowney*, *supra*, 35 Cal.4th at p. 1063.)

b.      *The Corporate Panamanian Defendants' Contacts with California*

Plaintiffs argue the trial court erred in not considering whether minimum contact could be shown for the corporate Panamanian defendants based on Vasquez's and Marcucci's activities in California as corporate officers of the corporate defendants.  We agree.

The trial court rejected plaintiffs' agency theory as it related to Hernandez's contacts, concluding based on Vasquez's declaration that the corporate Panamanian defendants had not hired Hernandez or authorized his representations, and that the plaintiffs had failed to provide sufficient evidence of an agency relationship.  The trial

19

court determined, in the absence of evidence supporting a finding of agency as to Hernandez, his actions did not support a finding of jurisdiction as to the corporate defendants.[12]  The assumption of jurisdiction over a foreign corporation is not warranted by """"sales and sales promotion within the state by independent nonexclusive sales representatives.""'  [Citation.]"  (*Archibald v. Cinerama Hotels* (1976) 15 Cal.3d 853, 864.)

Although the trial court acknowledged Vasquez's trips to California in connection with its discussion regarding the plaintiff's agency theory involving Hernandez, because the trial court also found no minimum contacts on the part of Vasquez or Marcucci, it did not address whether Vasquez's or Marcucci's actions were sufficient to confer specific personal jurisdiction on the corporate Panamanian defendants.  Inasmuch as we conclude that Vasquez and Marcucci did purposefully avail themselves of the California forum and had the requisite minimum contacts, we turn to the question whether their actions were sufficient to confer jurisdiction of the Panamanian corporate defendants.

In *Anglo Irish*, *supra*, 165 Cal.App.4th 969, the court held that the corporate entities and their officers purposefully availed themselves of the California forum

---

[12]     Plaintiffs argue that the purposeful availment prong was satisfied under an agency theory by showing the Panamanian defendants purposefully and voluntarily directed their activities towards California by hiring Hernandez, a real estate agent licensed in California and ratifying his conduct.  Although Vasquez's declaration does not discuss her attendance at the April 2010 investor meeting or any alleged representations she made during the meeting, she does deny Hernandez served as the authorized agent of the Panamanian defendants, declaring that they did not hire him, authorize him to make representations on behalf of the Panamanian defendants, or assert any authority over his marketing presentations to potential investors.  The trial court declined to find an agency relationship existed with Hernandez and the Panamanian defendants.  Although it determined "most of the contact with [p]laintiffs was through Hernandez," it found Vasquez's declaration challenged the alleged agency relationship between the Panamanian defendants and Hernandez, and that plaintiffs had not offered any evidence "supporting or elucidating the relationship between the Panama[nian] [d]efendants and Hernandez."  It thus rejected the theory that purposeful availment could be shown through Hernandez's contacts with California and the plaintiffs.

benefits because they purposefully directed their activities to California residents by and through three corporate officers who had discussions with potential investors during three separate visits to California to evaluate the potential investors, answer their questions regarding certain leveraged investments, and obtain millions of dollars in investments from the California residents on the corporations' behalves. (*Id*. at p. 984.) The court pointed out that "[a] corporation or other business entity acts through authorized individuals, and the activities of its employees are attributed to the business entity for purposes of personal jurisdiction. [Citation.]" (*Id*. at p. 981.) The court found "reliance on state substantive law of agency and alter ego to determine the constitutional limits of specific personal jurisdiction is unnecessary and is an imprecise substitute for the appropriate jurisdictional question." (*Id.* at p. 983.) The court stated, "[t]he proper jurisdictional question is not whether the defendant can be liable for the acts of another person or entity under state substantive law, but whether the defendant has purposefully directed its activities at the forum state by causing a separate person or entity to engage in forum contacts. That constitutional question does not turn on the specific state law requirements of alter ego or agency, although the inquiry may be similar in some circumstances." (*Ibid*., fn. omitted.)

Although the trial court here applied the principles of agency discussed in *Anglo Irish* when it determined Hernandez's contacts with the plaintiff were not imputable to the Panamanian defendants, it did not separately determine whether the corporate Panamanian defendants purposefully directed their activities at California, making the exercise of specific personal jurisdiction proper, apart from any question of Hernandez's agency. (*Anglo Irish*, *supra*, 165 Cal.App.4th at pp. 983-984.)

The record reveals undisputed evidence demonstrating the individual defendants acted on behalf of the corporate Panamanian defendants, as well as demonstrating, at a minimum, a close business relationship between the Panamanian defendants. Vasquez provided Solano with a business card identifying herself as the Chief Executive Officer for Inmobiliaria and R.G. Hotels, and she stated in her declaration that she is a corporate officer and shareholder for each of the corporate Panamanian defendants. Marcucci

21

identified himself in email correspondence with Hernandez as the President of R.G. Hotels and executed the Solanos' 2008 Bambito Purchase Agreement on behalf of Inmobiliaria. The 2008 Bambito Purchase Agreements for Batanero, Molina, and Saldana identify Marcucci as the authorized legal representative executing the contracts on behalf of Inmobiliaria, but each of those contracts appears to bear the signature of Vasquez. As consideration for the 2008 Bambito Purchase Agreement, Inmobiliaria accepted nearly $300,000 in investment funds from plaintiffs for the purchase of Bambito units, which Vasquez and Marcucci credited to Farallon under the 2011 Playa Blanca Purchase Agreements. Plaintiffs signed the Rental Program Agreements with Farallon, but it was administered by R.G. Hotels, who sent several rental payments under the agreement to Solano and whose representatives communicated via email with Solano. We note that Vasquez's declaration, which was the only declaration submitted in support of the motion to quash, does not address the specific working relationships among the various Panamanian defendants and provides no basis for declining to exercise specific personal jurisdiction over the corporate Panamanian defendants based on the actions of Vasquez and Marcucci.

Further, the trial court did not analyze whether Vasquez's California activities in 2010 and 2011 could be imputed under an agency theory to the other Panamanian defendants, given that she is a corporate officer of each of the corporate Panamanian defendants and has acted as the legal representative of some of these defendants on behalf of Marcucci. Instead, the trial court acknowledged Vasquez's two trips to California when considering the fairness prong of the minimum contact analysis, but concluded "even if the [c]ourt were to make findings favorable to [p]laintiff[s] regarding fairness, it would only reach [Vasquez], placing the parties in a position in which they would have to litigate in two forums." This conclusion was erroneous, given that the trial court had not analyzed whether Vasquez's actions in California could be imputed to the remaining Panamanian defendants.

The court also did not analyze whether jurisdiction could be established over the corporate defendants apart from the actions of Vasquez and Marcucci. In *Goehring v.*

22

*Superior Court* (1998) 62 Cal.App.4th 894, the court found that the contracts at issue, which included sales, security and escrow agreements, were "insufficient to establish jurisdiction because they [did] not establish petitioners *purposefully availed* themselves of forum benefits. '"Purposeful availment" requires that the defendant "have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."' [Citation.] A contract with an out-of-state party does not automatically establish purposeful availment in the other party's home forum. (*Burger King*[, *supra*,] 471 U.S. [at p.] 478 . . . ; [*Vons*], *supra*, 14 Cal.4th at p. 450 . . . .) Rather, a court must evaluate the contract terms and the surrounding circumstances to determine whether the defendant purposefully established minimum contacts within the forum. Relevant factors include prior negotiations, contemplated future consequences, the parties' course of dealings, and the contract's choice-of-law provision. ([*Burger King*], *supra*, . . . at pp. 478-482 . . . .)" (*Goehring*, *supra*, at p. 907.)

"Applying these principles," the court found the "petitioners did not purposefully avail themselves of California benefits by executing the sales, security and escrow agreements. The contract negotiations occurred in Texas. The sales and security agreements and promissory notes were governed by Texas law. The transaction documents were prepared by a Texas law firm. The transaction closed in Texas. The documents were executed in Texas and payments necessary to close the transaction were provided to a bank in Texas. The sales and security agreements concerned only *Texas-based* pay telephones that were required to remain in Texas; thus, all future consequences were in Texas." (*Goehring v. Superior Court*, *supra*, 62 Cal.App.4th at p. 907.)

Here, however, while the contracts at issue were prepared in Panama, they were negotiated, to the extent any negotiation occurred, in California. The defendants also had multiple contacts with the California plaintiffs, entering into multiple contracts with each plaintiff. Although the property at issue was located in Panama, a portion of the obligations were to be performed in California regarding the payment of rent and return on the plaintiffs' investments. The evidence thus supports finding the corporate Panamanian defendants purposefully availed themselves of California benefits by

23

entering into contracts with California residents which required them to make payments to those residents. (*Goehring v. Superior Court*, *supra*, 62 Cal.App.4th at p. 907.)

> 2. *Reasonableness of the Exercise of Jurisdiction*[13]

In determining under the third prong whether asserting personal jurisdiction "'would comport with "fair play and substantial justice,"'" the court "may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies."' [Citation.]" (*Vons*, *supra*, 14 Cal.4th at pp. 447, 448, quoting *Burger King*, *supra*, 471 U.S. at pp. 476, 477; accord, *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 113 [107 S.Ct. 1026, 94 L.Ed.2d 92].) There are no bright line rules for determining jurisdiction. "'[R]ather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.'" (*Pavlovich, supra,* 29 Cal.4th at p. 268.) Courts, however, should exercise great care and reserve when determining whether personal jurisdiction should extend to a nonresident, international defendant. (*Asahi Metal Industry Co.*, *supra*, at p. 115; *Anglo Irish*, *supra*, 165 Cal.App.4th at p. 978.)

The factors above "'sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. [Citations.] On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' (*Burger King*, *supra*, 471 U.S. at p. 477.)" (*Anglo Irish*, *supra*, 165 Cal.App.4th at pp. 979-980, fn. omitted.)

---

[13] Defendants conceded the second prong of the test, that the claim arose out of defendants' forum-related activities.

The trial court noted the Panamanian defendants' argument that "it would be unfair to exercise jurisdiction because the contracts at issue call for the dispute to be resolved in Panama, under Panamanian laws, and the dispute involves Panamanian real property. That the real estate developments at issue are located in Panama weighs in favor of a finding that Panama has a greater interest than California in adjudicating claims related to the developments. (See *Lifeco Services Corp. v. Superior Court* (1990) 222 Cal.App.3d 331, 335.) Plaintiffs argue that the interest of the forum state should prevail, however, "because California has an interest in protecting its residents from [being] target[ed] by fraudulent overseas real estate ventures. Plaintiffs rely on *Calder v. Jones* (1984) 465 U.S. 783, 791 [104 S.Ct. 1482, 79 L.Ed.2d 804] to argue that the location where the effects of the contract are felt is more relevant than the location of the land. Thus, [p]laintiff[s] argue[] that where middle class California citizens have been targeted, California has a compelling interest."

In *Calder*, the Supreme Court held that a California court had personal jurisdiction over two Florida defendants based on an allegedly libelous article the defendants wrote and caused to be published in the National Enquirer about the plaintiff, a well-known entertainer who lived and worked in California. (*Calder v. Jones*, *supra*, 465 U.S. at p. 788.) The Supreme Court determined that the defendants had sufficient minimum contacts because California was" the focal point both of the story and of the harm suffered." (*Id.* at p. 789.) Further, the court concluded that the individual defendants knew that the brunt of that injury would be felt by the entertainer in California where she lived and worked and in which the National Enquirer has its largest circulation. Under the circumstances, the defendants could " 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." (*Id*. at pp. 789-790.)

Here too, defendants were well aware of the effect their actions had on plaintiffs and "that the brunt of that injury would be felt by [the plaintiffs] in the State in which" they lived. (*Calder v. Jones*, *supra*, 465 U.S. at pp. 789-790.) When Vasquez met in California with plaintiffs in April 2010, she told them that Bambito was still under

25

construction and asked them to be patient, assuring them that they would receive a return on their investment when the condominium units were sold in six months. She also told them that she could not return their investment at that time because their investment funds were "tied up in construction."

Despite these assurances, plaintiffs had not received any return on their investments a year later, when Vasquez again met with them in April 2011 in California. At that time, Vasquez told plaintiffs that Bambito was not progressing as expected, construction was not complete, and plaintiffs' investments would therefore be exchanged for ownership of units at Playa Blanca, which was nearly complete. She assured plaintiffs that the Playa Blanca units would be resold to a third party by October 2012 and that plaintiffs would receive the return of their investment along with a profit. When some of the plaintiffs asked for the immediate return of their investments, Vasquez again said it would be impossible to return the money because the money was "tied up in construction." The contracts plaintiffs signed also provided that plaintiffs would receive rental income.

When Solano and Molina traveled to Panama, Vasquez and Marcucci assured them that Farallon was an experienced developer with the expertise and resources to resell the Playa Blanca condominium units. Solano and Molina had invested their money in the various resort projects with the expectations of their investments being for a short term, and both Marcucci and Vasquez assured Solano and Molina that their Playa Blanca unit would be among the first to be resold. Yet, the unit was not resold. Further, despite the plaintiffs' expectations of receiving rental payments under their Rental Program Agreements, no rental payments were made to any of the plaintiffs for approximately a year. Solano only received rental income after he made multiple requests for payment. Solano and Molina also sent emails to Marcucci regarding the return on their investments before their 2011 Playa Blanca Purchase Agreement was scheduled to expire on October 8, 2012. Despite assurances from Marcucci that the investments would be canceled and the money would be returned, neither Solano nor Molina received their money. Hernandez also contacted Marcucci regarding complaints from investors.

26

Although Marcucci told Hernandez the investments would be canceled or reversed, the plaintiffs' investments were not canceled, and their money was not returned.

The Panamanian defendants were well aware that plaintiffs had invested money in the development projects and had been promised returns on their investments. The losses of the money invested would be felt in California, where plaintiffs resided and where they expected to receive their money. "Under the circumstances, [defendants] must 'reasonably anticipate being haled into court [in California]' to answer for" their failure to make the promised payments to the plaintiffs in California. (*Calder v. Jones*, *supra*, 465 U.S. at p. 790.) Plaintiffs "injured in California need not go to [Panama] to seek redress from persons who, though remaining in [Panama], knowingly cause the injury in California." (*Ibid.*)

The trial court found that "[a]rguably, it would not be unreasonable for the [c]ourt to exercise jurisdiction if minimum contacts were shown as to all of the moving [d]efendants. However, even if the Court were to make findings favorable to [p]laintiff[s] regarding fairness, it would only reach [Vasquez], placing the parties in a position in which they would have to litigate in two forums." (See *Vons*, *supra*, 14 Cal.4th at p. 448 [plaintiffs' "interest in convenient and effective relief within the forum" and the interest of "judicial economy" would best be served by resolving the matter in the forum having jurisdiction over all defendants rather than litigating or arbitrating the matter piecemeal in two different forums].) For these reasons, the court granted the motion to quash.

As discussed above, the trial court erroneously failed to consider several bases on which jurisdiction might be asserted over all Panamanian defendants. Upon considering these bases, the court may reach a different conclusion regarding the reasonableness of asserting personal jurisdiction over defendants.

## DISPOSITION

The order is reversed and the matter remanded for further proceedings consistent with the views expressed herein.  Plaintiffs are to recover their costs on appeal.


GARNETT, J.[*]


We concur:


PERLUSS, P. J.


SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.